IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAIN VASQUEZ GONZALEZ,<br><br>Petitioner,<br><br>v.<br><br>LEONARD ODDO, *in his official capacity as Warden of Moshannon Valley Processing Center, et al.*,<br><br>Respondents. | ) | Civil Action No. 3:25-cv-424<br><br>Magistrate Judge Maureen P. Kelly<br><br>Re: ECF Nos. 31 and 53 |

**MEMORANDUM ORDER**[1]

Currently before this Court is Petitioner's Second Motion to Enforce. ECF No. 31. In this Motion, Petitioner seeks enforcement of this Court's prior Order granting of a writ of habeas corpus, see ECF No. 29, and securing his release from subsequent unauthorized and unlawful detention by agents of the Department of Homeland Security ("DHS") on June 26, 2026, in violation of that Order. ECF No. 31 at 1. Because it is undisputed that Petitioner was released later that day, see ECF No. 34 at 1, and there is no indication that he has been detained again since then, this Motion must be denied as moot.

But also before this Court is the issue of the appropriate consequences for Respondents and their agents for disregarding the Order granting the Writ, and for their conduct in this litigation after the Second Motion to Enforce was filed. For the reasons that follow, the undersigned holds Respondents John E. Rife ("Rife"), Markwayne Mullen ("Mullen"), and Todd Blanche

[1] The Parties have consented to the jurisdiction of a United States Magistrate Judge. ECF Nos. 6 and 10. The later substitution of various Respondents for their successors in office, see ECF No. 41, does not withdraw that consent. See Brook, Weiner, Sered, Kreger & Weinberg v. Coreq, Inc., 53 F.3d 851, 852 (7th Cir. 1995); see also Gomez v. Vernon, 255 F.3d 1118, 1126 (9th Cir. 2001).

("Blanche"), in their official capacities, in civil contempt, and concludes that the appropriate sanction is for them, in their official capacities, to pay Petitioner's reasonable attorney fees and costs.

Because there is no indication that Respondent Leonard Oddo ("Oddo") or his agents were involved in the acts or omissions giving rise to and following the Second Motion to Enforce, he is excluded from any finding of contempt or sanctions arising therefrom.

## I. RELEVANT FACTUAL BACKGROUND

Petitioner Nain Vasquez Gonzalez ("Petitioner") was, at the initiation of this action, an immigration detainee held at the Moshannon Valley Processing Center ("MVPC") in Phillipsburg, Pennsylvania. On April 28, 2026, this Court issued a writ of habeas corpus directing the formerly-named Respondents to release Petitioner from immigration detention forthwith. ECF No. 29. The record indicates that Petitioner was released on later the same date. ECF No. 30.

Prior to the intervention of this Court, Petitioner spent more than three years in immigration detention – a substantial portion of which was attributable to the failure of Board of Immigration Appeals ("BIA") to comply with the mandate of the United States Court of Appeals for the Third Circuit. The background of Petitioner's underlying immigration proceedings, and this Court's eventual order that Petitioner be released from his unconstitutionally prolonged immigration detention, are available at Vasquez Gonzalez v. Oddo, No. 3:25-cv-424, 2026 WL 1139544 (W.D. Pa. Apr. 28, 2026).

On June 26, 2026 – just shy of two months after Petitioner was released pursuant to this Court's Order – Petitioner again was arrested by Immigration and Customs Enforcement ("ICE") agents. ECF No. 31 at 1. The circumstances surrounding his arrest are disputed. Petitioner alleges that ICE officers asked him if he was named "Fernando Daniel," and disbelieved his answer in the

negative. ECF No. 34 at 1. Petitioner further alleges that the ICE agents refused to review his identification, or this Court's Order granting his release, when they arrested him. Id. See also Pet'r's Decl., ECF No. 66-2 at 2-3 ("There were four agents in two cars. The agent who talked to me asked if I was legal. I told him I had come out of detention and had a release order in my wallet. He did not look at or let me take it out. Instead, he told me he was looking for someone named Fernando Daniel. He took my picture and then arrested me. He cuffed my hands. When I told him again that I had my release paper he said 'that doesn't matter, we're just doing our job.'")

Respondents dispute Petitioner's recitation of events. In what appears to be the final draft of their version,[2] Respondents assert that their agents were searching for "intended targets" during a "nationwide surge in enforcement" the morning of June 26, 2026, when they encountered Petitioner.[3] Second Decl. of Michael B. Smith, ECF No. 45-1 at 2; Decl. of Amir Zayed, ECF No. 51-3 at 2 and 4. Respondents aver that their agents could not tell whether Petitioner was one of their "intended targets" because he was wearing a surgical mask. ECF No. 51-3 at 2. They claim, however, that he "resembled one of the targets on [their] list."[4] Id. at 2. Petitioner was stopped, his mask was removed, he was photographed, and his photograph was analyzed by facial

---

[2] As will be discussed in more detail herein, Respondents provided multiple, contradictory declarations regarding the circumstances of Petitioner's arrest and the reasons for their recurring fumbles when responding to this Court's subsequent orders.

[3] Given Respondents' agents' averments that a team of 15 ICE agents arrested 20 individuals within a period of an hour and a half, and 27 individuals in the course of that day, ECF No. 45-1 at 2, it appears that their stated goal of "targeted enforcement" in their sworn declarations, see id. at 3, might not be entirely forthright.

[4] Given Respondents' apparent position that Petitioner's face was hidden, it is unclear on what basis they determined that he resembled one of their alleged targets. Respondents never clarify this assertion in the numerous sworn statements of their agents, nor do they ever otherwise provide any support for it.

recognition software accessed through the "Mobile Fortify" application on the ICE agents' cellular phones.[5] According to the alleged results and Petitioner's own statements during the stop, Petitioner was in the United States unlawfully. Id. at 2-3.

According to Respondents, Petitioner allegedly never informed ICE agents that he had been granted a writ of habeas corpus by this Court, and allegedly did not have a copy of that Order in his possession. Accordingly, after a brief encounter that lasted approximately three minutes, Deportation Officer Amir Zayed arrested Petitioner, and "he was transported for further processing." ECF No. 51-3 at 3-4.

The above factual dispute seems straightforward enough. The problem – beyond, of course, the issue of Petitioner's underlying arrest in direct violation of the Order granting him habeas relief from his immigration detention, see ECF No. 29 – is how much effort it has taken to get to this point as the result of Respondents' conduct.

## II. RELEVANT PROCEDURAL HISTORY

The Second Motion to Enforce was filed at 3:43 PM on Friday, June 26, 2026 – the same date on which Petitioner was arrested. ECF No. 31. On Monday, June 29, 2026, this Court set deadlines for Respondents to respond to the Motion, and scheduled a telephonic status conference. ECF Nos. 32 and 33. On the same date, Petitioner filed a Response and Update providing additional details regarding his arrest and confinement, and confirming that he had been released from detention at about 7:00 PM on June 26, 2026. ECF No. 34 at 1.

On June 29, 2026, Respondents filed their first of many responses to the issues arising from Petitioner's arrest. ECF No. 37. This first response did not include much new information;

[5] It is unclear from record whether Petitioner consented to any of these actions.

however, Respondents indicated therein that a declaration from ICE agents had been requested. Id. at 2.

On June 30, 2026, Respondents submitted what would be the first of several sworn declarations of ICE Supervisory Detention and Deportation Officer Michael B. Smith. First Decl. of Michael B. Smith, ECF No. 39-1. In it, he stated, subject to penalty of perjury, that Petitioner had been arrested after a field interview, and averred that "[a]t no point during the field interview did Petitioner mention that he was released from ICE custody pursuant to the WDPA issuing a writ of habeas corpus, ordering his release." Id. at 1. ICE released Petitioner from custody once its agents discovered the Order granting the writ during their processing of Petitioner. Id. at 2. Despite including boilerplate language that Smith's declaration was "based upon information and belief derived from an inspection of DHS records, my own personal knowledge of the case and consultation with deportation officers under my supervision[,]" id. at 1, it is apparent that nothing in the declaration was based on Smith's first-hand observations. Further, Smith did not provide the identities of any individual or individuals with such knowledge. As a result, Smith's first declaration is speculative, unverifiable, and of little value.

On July 1, 2026, the undersigned held a status conference with counsel regarding Petitioner's arrest. ECF No. 40. At the status conference, Respondents were ordered "to file declarations from ICE representatives with first hand knowledge, as explained by the Court. Declarations with any related documentation and body cam footage to be provided by Friday, 7/10/26." Id. at 1.

Respondents' submission of July 10, 2026, provided little additional relevant details. ECF No. 45. On that date, Respondents submitted a second declaration from Smith, ECF No. 45-1; the first of two declaration from Acting Supervisory Detention and Deportation Officer Jonathan M.

Colon, ECF No. 45-2; the declaration of Deportation Officer Rocco DiCarlo, ECF No. 45-3; the declaration of Deportation Officer Connor P. Rigione, ECF No. 45-4, and a copy of "ICE Directive 19010.3" regarding the use of body-worn cameras, issued on February 19, 2025, ECF No. 45-6.

Again, despite a clear Court directive, none of these declarations were made by individuals who had first-hand knowledge of what occurred during Petitioner's arrest. Instead, Smith's second declaration on that point was mostly speculation dressed up as averments of fact. However, Smith did indicate that he personally reviewed "2 hours of body camera footage for the twenty arrests conducted the morning of June 26, 2026," but was unable to locate a video of Petitioner. ECF No. 45-1 at 3. He went on to explain that ICE policy did not require the use of body cameras except under particular circumstances, which he speculated did not apply to Petitioner's arrest, id., and that none of the ICE agents with whom he had spoken with had independent recollection of Petitioner, id. at 4. Thus, Smith was unable to identify the agent who arrested Petitioner. Id.

The additional declarations in this submission also were not particularly helpful – except that Colon averred that ICE processing sheets for arrestees "list the supervising detention and deportation officer for statistical purposes rather than the arresting officer[,]"[6] and that he released Petitioner from custody on Smith's orders. ECF No. 45-2 at 2.

Additionally, and despite Respondents' agents' averments that they were unable to identify the agent who had arrested Petitioner, DiCarlo provided a spreadsheet with his declaration indicating that Petitioner had been arrested by arrest team "FNE 1 & 6." ECF No. 45-4 at 1.

---

[6] It is unclear what "statistical purposes" are served by omitting the identity of an arresting officer from an arrestee's records. But ICE's apparent practice of obfuscating the identities of the agents involved in arrests is deeply troubling. See Escobar Molina v. U.S. Dep't of Homeland Sec., 811 F. Supp. 3d 1, 64 (D.D.C. 2025) ("Requiring defendants to put pen to paper and explain who made each arrest and why constitutes the bare minimum to ensure defendants are compliant with the Constitution, the INA, and this Court's order, given the blatant misstatements about the INA's requirements for such arrests repeatedly espoused by DHS high-ranking officials.").

Therefore, on July 20, 2026, this Court ordered Respondents to provide "the names and agency affiliations of the officer or officers who arrested Petitioner[,]" or "the names and agency affiliations of each and every member of Arrest Team 'FNE 1 & 6,' along with a sworn declaration or affidavit explaining with particularity each and every step taken in the investigation to determine the identity or identities of the officer(s) responsible for Petitioner's arrest" on or before July 30, 2026. ECF No. 49 at 1-2. Respondents further were ordered to:

> review any and all body camera footage of every member Arrest Team "FNE 1 & 6" taken between 8:00 am and 9:30 am on June 26, 2026. On or before July 30, 2026, Respondents shall provide body camera footage of Petitioner's arrest and detention to this Court and to Petitioner's counsel. In the event that Respondents indicate that they are unable to locate any body camera footage of Petitioner, they shall submit the entirety of the body camera footage of every member [of] Arrest Team "FNE 1 & 6" taken between 8:00 am and 9:30 am on June 26, 2026, to this Court and to Petitioner's counsel, along with a sworn declaration or affidavit attesting to the completeness of the same.

Id. at 2.

On July 30, 2026, Respondents finally identified Zayed as the individual who arrested Petitioner. ECF No. 51 at 1. Their submission on this date included a declaration of Supervisory Detention and Deportation Officer Zachary E. Hathaway explaining that Zayed had no body camera footage of Petitioner's arrest because his body camera was not active at that time. Decl. of Zachary E. Hathaway, ECF No. 51-1 at 3-4. Hathaway averred that "pursuant to established policies, his body camera is to be always activated during planned enforcements, such as the surge that began June 26, 2026[.]"[7]

[7] This assertion contradicts Smith's earlier statement in his second declaration that ICE agents are required to use body cameras only under much more limited circumstances. See ECF No. 45-1 at 3.

Respondents further submit an unsworn memorandum from Zayed indicating that his body camera had not been charged on June 26, 2026, because he had left it activated the night before. ECF No. 51-2 at 2. They also submitted Zayed's declaration, in which he recited his version of events at Petitioner's arrest, consistent with the factual dispute outlined above. ECF No. 51-3 at 1-4.

Contrary to the requirements of the Order of July 20, 2026, Respondents submitted no body camera footage by July 30, 2026, or sought an extension of time in which to do so. Therefore, on August 4, 2026, Respondents were ordered to show good cause why they should not be sanctioned for that failure, with a response deadline of August 11, 2026. ECF No. 54. On August 5 and 7, 2026, Respondents filed motions to leave to file the body camera footage under seal, ECF No. 54, then redacted versions of the footage, ECF No. 56, and for a protective order prohibiting its dissemination to the public or its use by Petitioner's counsel in unrelated judicial proceedings.[8]

---

[8] The bases asserted by Respondents for the motion to seal, ECF No. 54, the motion to file redacted versions of the videos, ECF No. 56, and the motion requesting a protective order, ECF No. 57, were to protect third-party arrestees from embarrassment, and to safeguard their privacy. See, e.g., ECF No. 57 at 3-4. At the outset, it is difficult to contrive any privacy interest that third parties might have with respect to being arrested in public. To the contrary, both individuals and society benefit when acts of government agents are open and known to the public. See United States v. Johnson, 862 F.2d 1135, 1151 (5th Cir. 1988) (Goldberg, J., dissenting) ("While I will not quibble with the majority over what constitutes humiliation, I believe that the value of public police practices in a democratic society is immeasurable.").

Indeed, exposing the actions of police to public scrutiny is a foundational principle underlying our constitutional republic. See THE FEDERALIST NO. 84 (Alexander Hamilton) ("'[C]onfinement of the person, by secretly hurrying him to jail, where his sufferings are unknown or forgotten, is a less public, a less striking, and therefore A MORE DANGEROUS ENGINE of arbitrary government.' And as a remedy for this fatal evil he is everywhere peculiarly emphatical in his encomiums on the habeas-corpus act, which in one place he calls 'the BULWARK of the British Constitution.'") (emphasis in original, footnotes with citations omitted).

Additionally, Respondents' own actions and filings support the conclusion that the privacy of third parties might not have been their sole motivation for shielding the video evidence of their agents' (continued . . .)

ECF No. 57. These motions all were denied. ECF Nos. 55, 58, and 59.

Respondents finally submitted body camera footage from a total of five ICE agents on August 11 and August 12, 2026. ECF Nos. 60, 61, 63, and 64. Along with these videos, Respondents submitted two declarations certifying their completeness – although the declarants, Smith and Colon, did not aver to having been involved in the collection of these videos, or indicate

---

actions from public view. First, in the motion for protective order, Respondents sought to bar Petitioner and his counsel from showing "even the redacted footage to persons outside the Legal Services of New Jersey office who are unrelated to Petitioner Vasquez Gonzalez's case or in some other, unrelated judicial proceeding in which the Legal Services of New Jersey acts as counsel." ECF No. 57 at 6. This Court can contrive no legitimate reason for such a limitation to be imposed on the use of even the redacted video footage.

The second is the ICE agents' use of masks to hide their identities, which Zayed avers to be "[p]er protocol" and "for safety and security purposes[,]" ECF No. 51-3 at 4-5, but which, to this day, has been used as a reason why Respondents are unable to disclose the identities of the agents involved in Petitioner's arrest. See id. at 5 ("Because the officer was standing behind me and wearing a mask, I cannot identify the officer."). As other courts have recognized, "[r]eports of masked agents making what appear to be civil immigration arrests without identification or explanation are widespread[.]" Escobar Molina, 811 F. Supp. 3d at 64 (D.D.C. 2025). Accord. Am. Ass'n of Univ. Professors v. Rubio, 802 F. Supp. 3d 120, 174 (D. Mass. 2025). And as one judge has found:

> This Court has listened carefully to the reasons given by Öztürk's captors for masking-up and has heard the same reasons advanced by the defendant Todd Lyons, Acting Director of ICE. It rejects this testimony as disingenuous, squalid and dishonorable. ICE goes masked for a single reason -- to terrorize Americans into quiescence. Small wonder ICE often seems to need our respected military to guard them as they go about implementing our immigration laws. It should be noted that our troops do not ordinarily wear masks. Can you imagine a masked marine? It is a matter of honor -- and honor still matters.

Rubio, 802 F. Supp. 3d at 174.

The United States does not have a secret police force. Accord. id. Respondents' attempt to cloak from view the identities and the public acts of their armed agents is deeply troubling, and – at its core – unamerican. And to the extent that Respondents would rely on their asserted "protocol" to avoid disclosure of the identities of their agents pursuant to the Order of this Court, ECF No. 49, they will find that their masks will not shield them from sanctions.

with specificity how they determined that the production was complete.[9] ECF Nos. 62-1 and 62-2. However, Respondents submitted no explanation why they could not have complied with this Court's earlier Order, nor did they provide any argument as to why they should not be sanctioned for their failure to do so.

On August 25, 2026, Petitioner submitted a timely Reply. ECF No. 66. In it, Petitioner characterized Respondents' changing stories, and their failure to produce body camera footage of Petitioner's arrest, as implausible and evasive. Id. generally and at 3. Petitioner addressed several inconsistencies between Respondents' agents' various declarations, and alleged that, despite Smith's assertion that he had reviewed two hours of body camera footage recorded during the relevant period of time, Respondents had produced only about 30 minutes of footage in response to the Order to Show Cause. Id. at 9-10. Additionally, he noted Respondents' lack of legal argument against the imposition of sanctions. Id. at 3. Petitioner urged this Court to issue sanctions, and to hold "The Government" in criminal and civil contempt. Id. at 12. Petitioner submitted his own declaration with the Reply, the substance of which is discussed in more detail above. ECF No. 66-2. After a thorough review of the record, this is the only evidence submitted by a declarant claiming to have first-hand knowledge and an actual recollection of what happened during Petitioner's arrest on June 26, 2026.[10]

---

[9] Both Smith and Colon include identical boilerplate assertions that their declarations are based "upon information and belief derived from an inspection of DHS records, my own personal knowledge of the case and consultation with deportation officers under my supervision." Third Decl. of Michael B. Smith, ECF No. 62-1 at 1; Second Decl. of Jonathan Colon, ECF No. 62-2 at 1. But without any factual averments explaining, specifically, how they became aware of the information upon which they based their certifications, this boilerplate is meaningless, and ultimately no substitution for evidence based on personal observation.

[10] Despite Respondents' numerous declarations making conclusive assertions regarding Petitioner's alleged acts and omissions during his arrest – and specifically regarding notifying ICE (continued . . .)

In apparent recognition of the hole that they had dug for themselves, Respondents moved for leave to rile a sur-reply. ECF No. 67. Respondents filed their Sur-Reply, with leave of Court, on September 1, 2026, in which they – for the first time – attempted to show cause why they should not be sanctioned. ECF No. 69. They argued that "Petitioner's statements [were] unfounded and speculative[,]" and that "any delays or perceived inconsistencies [in their responses] resulted from ICE's scramble to get the Court the answers it **requested** in short order and in the wake of making a mistake that understandably frustrated the Court and caused Petitioner distress."[11] Id. at 1-2

---

agents that he had been granted federal habeas relief – only Zayed's declaration is of an ICE agent who actually was present at Petitioner's arrest. ECF No. 51-3. But Zayed does not aver to have independent recollection of the event. Id. at 1 (inserting a boilerplate assertion that his declaration was "based upon information and belief derived from an inspection of DHS records, my own personal knowledge of the case and consultation with deportation officers under my supervision."). Moreover, it is Respondents' position that none of their agents recalled arresting Petitioner. See, e.g., Decl. of John Belluardo, ECF No. 69-1 at 3 ("None of the officers questioned had a way to readily identify or an independent recollection of [Petitioner]"). See also ECF No. 45-1 at 7 ("Despite inquiring of each member of both teams working on arrests the morning of June 26, 2026, none of the officers have a personal recollection of any interaction with Petitioner or any interaction as described by Petitioner's attorney. Thus, I cannot definitively identify which Newark ERO officer conducted the arrest or verify the precise time and location of the encounter.").

Further, Respondents are insistent that no body-camera footage of Petitioner's arrest exits because Zayed failed to charge his camera's battery the night before. ECF No. 51-2. Amazingly, Respondents have not provided any video footage of Petitioner's arrest taken from other ICE agents, despite their somewhat contradictory assertions that Petitioner was arrested during a so-called "surge" that also somehow was part of targeted enforcement operations, ECF No. 45-1 at 2, and their averment that at least 15 agents were working in concert in the same area to arrest 20 suspected illegal aliens during the relevant period of time. Id.

Thus, the only evidence on the record of what actually occurred during Petitioner's arrest, submitted by someone who claims to actually remember what happened, is Petitioner's declaration at ECF No. 66-2. Everything else that is relevant to determining whether Petitioner informed ICE agents of this Court's Order granting the Writ is speculation.

[11] This Court did not "request" answers; it **ordered** Respondents to provide specific, relevant information in their possession, custody, or control by a set deadline, or to explain why they could not do so. Additionally, to the extent that Respondents maintain the position that their failure to comply with this Court's orders was somehow the result of a "scramble" to comply with those (continued . . .)

(emphasis added). They continued that they had been diligent in searching for the ICE agent who arrested Petitioner by reviewing body camera footage. Id. at 2.

> In responding to this Court's orders, ICE's actions focused on the Court's request to know as much information as possible about Petitioner's re-arrest. ICE's failure to comply with the Court's Order to produce all of the BWC from the time period surrounding Petitioner's arrest was not intentional disregard for the Court's order. Rather, it was an unintended oversight resulting from ICE's myopic focus on identifying Petitioner's arresting officer; explaining why it was unable to do so sooner; and attempting to locate BWC footage of this Petitioner's arrest. Upon receipt of the Court's Order to Show Cause, ICE complied and uploaded the BWC footage from 8:00–9:30 am on June 26, 2026.

Id. Respondents denied that they should be held in contempt, or otherwise be sanctioned. Id. at 4-5.

Along with their Sur-Reply, Respondents submitted the sworn declaration of Assistant Field Office Director John Belluardo. ECF No. 69-1. Belluardo declared that Petitioner "was not in possession of any habeas paperwork either on his person or in the bag he was carrying." Id. at 1. He also averred that he "understand[s] that [Petitioner] never communicated the existence of this order to any team member during the arrest or during his vehicle transport." Id. at 8.

How Belluardo can credibly make such an averment is unclear, and he does not assert that he was present at Petitioner's arrest, or searched his person or property, or viewed any video evidence of the same. Further adding to this mystery, Belluardo further averred that "[n]one of the officers questioned had a way to readily identify or an independent recollection of [Petitioner]." Id. at 3.

---

orders – a brain-teaser, to be sure – it is noteworthy that they could have, but did not, request an extension of time.

Indeed, of the many assertions made on Belluardo's declaration, only a few– relating to Belluardo's own background, his duties, and orders that he gave to flag Petitioner in ICE's "EARM" case management system, to collect camera footage, and regarding the use of body cameras while conducting arrests – appear to have been based on his own direct observations.[12] Id. at 1, 2, 5, and 7. Thus, Belluardo's declaration is of little use to this Court with respect to the matter before it.

As to the order to collect camera footage, Belluardo indicated five additional videos had been found – despite Respondents' prior certifications through Smith and Colon that they already had produced all of the body camera footage that was responsive to this Court's Order. Id. at 7; see also ECF No. 62-1 , ECF No. 62-2, and ECF No. 70. According to Belluardo – who does not aver to having been personally involved in the collection or production of any of the video footage – these additional videos had not been produced earlier because the ICE agent who had taken them had been part of Arrest Teams FNE1 or FNE6, but instead was in "a different unit who assisted [them] on June 26, 2026." ECF No. 69-1 at 7.

Petitioner filed a Sur-Sur-Reply, with leave of Court, on September 4, 2026. ECF No. 71. In it, he generally questioned the credibility of the declarations submitted by Respondents' agents, and reiterated his position that Respondents' should be sanctioned. Id. at 3-4.

## III. ANALYSIS

This Court has thoroughly reviewed the record in this case, including the parties' competing versions of events surrounding Petitioner's arrest and detention on June 26, 2026. As to that issue, only Petitioner's declaration provides an account of what happened by someone who

---

[12] Belluardo also might plausibly have knowledge of ICE protocol, the organization of subordinate ICE agents, and perhaps other information in his declaration as well. However, the assertions in his declaration, as written, do not conclusively establish any of that.

both actually observed the arrest, and who claims to have recollection of the same. ECF No. 66-2. Even though Zayed – the ICE agent who arrested Petitioner – submitted a declaration reciting his version of events, see ECF No. 51-3, it carries little weight in view of Respondents' own evidence that none of their agents actually remembered arresting Petitioner. See, e.g. ECF No. 69-1 at 3 ("None of the officers questions had a way to readily identify or an independent recollection of [Petitioner]"). See also ECF No. 45-1 at 7 ("Despite inquiring of each member of both teams working on arrests the morning of June 26, 2026, none of the officers have a personal recollection of any interaction with Petitioner or any interaction as described by Petitioner's attorney. Thus, I cannot definitively identify which Newark ERO officer conducted the arrest or verify the precise time and location of the encounter.").

Indeed, the declarations of Respondents' agents are rife with seemingly conclusive factual averments made by individuals who, upon review, lacked independent knowledge to support the statements to which they were attesting **under oath**. Such conduct is most disconcerting. At best, it undercuts the credibility of any future testimony from these individuals, and wastes the resources of the Court and the litigants. At worst, it is possibly perjury.[13]

Further, the bafflingly inconsistent and changing stories presented in Respondents' briefing regarding their failure to comply with this Court's Order of July 20, 2026, ECF No. 49, compels one of two conclusions. Respondents either: (1) willfully attempted to obfuscate the circumstances surrounding Petitioner's arrest and detention, as well as to hide the identities of the agent or agents involved therein; or (2) are unable to maintain proper records, utilize their own equipment and

[13] Respondents' counsel is reminded of her obligations of candor to the tribunal and truthfulness in statements to others under Rules 3.3 and 4.1 of the Pennsylvania Rules of Professional Conduct, which this Court takes seriously. Counsel is admonished to review those rules and the comments thereto, and to adhere to their requirements strictly in her future appearances in this Court.

tools, or read and comply the orders of this Court. While the undersigned doubts that Respondents' agents are as incompetent as they may appear in their inconsistent declarations –weighing the balance in favor of willful misconduct – the appropriate remedy of compensatory sanctions pursuant to a finding of civil contempt does not require a finding of willfulness. Thus, this Court need not determine today the depth of this disconcerting obfuscation.

In cases where, as here, the parties have fully consented to the jurisdiction of a United States Magistrate Judge, "the magistrate judge may exercise the civil contempt authority of the district court." 28 U.S.C. § 636(d)(4).[14] The United States Court of Appeals for the Third Circuit has recognized that civil contempt may be used as a means "either to compensate the injured party or to coerce the defendant into complying with the court's order." Roe v. Operation Rescue, 919 F.2d 857, 868 (3d Cir. 1990) (citing Gregory v. Depte, 896 F.2d 31, 34 (3d Cir.1990)). It follows that "[t]here are also two types of civil contempt fines. The first kind is payable to the complainant as compensation for damages caused by the contemnor's noncompliance. The second kind is payable to the court, but defendant can avoid paying the contempt 'fine' by performing the act required by the court's order." Roe, 919 F.2d at 868 (internal citations omitted).

Respondents argue that they have complied with – and continue to actively comply with – this Court's orders, and thus coercive contempt is unnecessary. ECF No. 69 at 4. Perhaps. It is beyond dispute that Petitioner was held in immigration detention for eleven hours on June 26, 2026, and later released. However, it remains at least somewhat doubtful whether Respondents

[14] Citing 28 U.S.C. § 636(e)(6)(A) and (B), Respondents argue that this Court must submit the issue of civil contempt to a district judge. ECF No. 69 at 3. Not so. The subsections cited by Respondents refer to criminal contempt, as well as to civil contempt in cases proceeding under Sections 636(a) and (b). Because the parties have fully consented to the jurisdiction of a magistrate judge, this proceeding is governed by Section 636(c). Thus, the undersigned is fully able to "exercise the civil contempt authority of the district court." 28 U.S.C. § 636(e)(4).

have fully complied with the Order dated July 20, 2026, ECF No. 49, or have otherwise contrived a situation with their agents' recording practices and willful obfuscation of their identities that they plausibly would be able to assert the impossibility of compliance. See ECF No. 45-2 at 2 ("The processing sheets list the supervising detention and deportation officer for statistical purposes rather than the arresting officer."). See also ECF No. 51-3 at 2 ("My body camera was not operational because the battery had not been charged."). Id at 4-5 ("Per protocol, all officers were wearing masks to obscure their identities for safety and security purposes. Because the officer was standing behind me and wearing a mask, I cannot identify the officer."). Be that as it may, even if this Court were persuaded by Respondents' arguments, compensatory fines still are available.

"To show civil contempt, a plaintiff must establish the following: (1) that a valid court order existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order." Roe, 919 F.2d at 871. Here there are two orders at issue.

The first is the Order granting the Writ, issued on April 28, 2026. ECF No. 29. This Order was served on Respondents' counsel the same day via the Court's electronic filing system. It was violated by Respondents' agents when they arrested Petitioner on June 26, 2026, and detained him for roughly eleven hours.[15] Knowledge of this Order, and of Petitioner's arrest, is imputed on Respondents under the law of agency. Anderson v. Att'y Gen of Pennsylvania, No. 17-1347, 2018WL 994052, at *2 (W.D. Pa. Feb. 21, 2018) (collecting cases for the proposition that "delivery to the agent is delivery to the principal and knowledge by the agent is imputed knowledge by the principal."). While Petitioner was released later that evening, it was not before his attorney became involved by both contacting Respondents' counsel and filing the Second Motion to Enforce. ECF

[15] Indeed, Petitioner avers in his declaration that he was carrying a copy of the Order on his person, and informed the ICE agents of the same at the time of his arrest, but they refused to look at it. ECF No. 66-2 at 2-3.

Nos. 31, 34, and 37 at 1. As a result of Petitioner's quite-justified filing of the Second Motion to Enforce, his counsel was required to respond to various Orders of this Court, and to attend a telephonic status conference. ECF Nos. 33, 35, 40, 42, 46, 47, and 50.[16]

The second order at issue was the Order dated July 20, 2026. ECF No 49. It was served on Respondents' counsel on the same date via this Court's electronic filing system. Respondents failed to comply with that Order "by either (1) providing body camera footage of Petitioner's arrest and detention, or (2) submitting "the entirety of the body camera footage of every member Arrest Team 'FNE 1 & 6' taken between 8:00 am and 9:30 am on June 26, 2026, to this Court and to Petitioner's counsel, along with a sworn declaration or affidavit attesting to the completeness of the same." See ECF No. 53. Further, their subsequent attempts to comply with that Order – set forth in more detail above – involved inconsistent, stories, dubious excuses. at least one inaccurate certification, and at least three attempts to shield their clearly public acts from scrutiny. Petitioner's counsel had to respond to all this as well, see ECF Nos. 66 and 71, and it likely would have resulted in even more work on Petitioner's part if this Court had not denied Respondent's motions at ECF Nos. 54, 56, and 57, without requiring a response. ECF Nos. 55, 58, and 59.

Respondents argue that they should not pay compensatory sanctions because Petitioner has not identified a specific harm that sanctions would remedy. ECF No. 69 at 5. However, as should be apparent from the preceding paragraphs, Petitioner's counsel was forced to perform real legal work in response to Respondents' sanctionable conduct. Thus, this Court holds that Petitioner's counsel is entitled to reasonable attorney's fees and costs associated with the same.

---

[16] Petitioner's initial letter brief at ECF No. 47 was stricken due to its failure to comply with the undersigned's Practices and Procedures. ECF No. 49. Thus, the effort of Petitioner's counsel to file a compliant brief at ECF No. 50 is excluded from this Court's calculation. However, that later filing is cited herein because it is the operative brief.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's Second Motion to Enforce, ECF No. 31, will be denied as Moot.

Respondents Rife, Mullen, and Blanche, in their official capacities, will be held in civil contempt, and as a sanction will pay Petitioner's reasonable attorney fees and costs.

Because there is no indication that Respondent Oddo or his agents were involved in the acts or omissions giving rise to and following the Second Motion to Enforce, he is excluded from any finding of contempt or sanction arising therefrom.

An appropriate Order follows.

AND NOW this 26th day of October, 2026, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that Petitioner's Second Motion to Enforce, ECF No. 31, is DENIED as MOOT.

However, IT IS FURTHER ORDERED that Respondents Rife, Millen, and Blanche, in their official capacities, are held in CIVIL CONTEMPT for the violations of this Court's Orders dated April 28, 2026, ECF No. 29, and July 20, 2026, ECF No. 49. Sanctions shall be in the amount of reasonable attorneys' fees and costs incurred by Petitioner and his counsel in relation to the Second Motion to Enforce, ECF No. 31, and subsequent related litigation in this matter ***except*** for the refiling of Petitioner's non-compliant letter-brief at ECF No. 47. See ECF Nos. 49 and 50.

Petitioner shall submit any motion for fees and/or costs, or a waiver of the same, on or before **November 9, 2026**. Respondents may respond to the issue of reasonable fees and costs on or before **November 23, 2026**.

BY THE COURT,

Maureen P. Kelly

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc: All counsel of record (*via* CM/ECF)